IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HENRY C. TANG, | § | |
| | § | No. 270, 2025 |
| Defendant Below, Appellant, | § | |
| | § | Court Below—Superior |
| v. | § | Court of the State of |
| | § | Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 2405008473 |
| Appellee. | § | |
| | § | |

Submitted: June 15, 2026
Decided: July 23, 2026

Before **SEITZ**, Chief Justice; **VALIHURA** and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Eric G. Mooney, Esq. *(argued)*, McKenzie Ankrom, Esq., THE LAW OFFICE OF ERIC G. MOONEY, P.A., Georgetown, Delaware, *for Appellant Henry C. Tang.*

Abby Adams, Esq. *(argued)*, DELAWARE DEPARTMENT OF JUSTICE, Georgetown, Delaware, *for Appellee State of Delaware.*

**GRIFFITHS**, Justice:

On May 17, 2024, a City of Lewes police officer noticed a vehicle driving at night without its headlights on. The police officer chose to follow the vehicle in his police cruiser instead of initiating a traffic stop. The vehicle drove erratically, and at one point, left its lane and drove onto a bike trail located in the shoulder of the roadway. Once again, the police officer decided to continue following the vehicle instead of initiating a traffic stop. The police officer followed the vehicle beyond the city limits of Lewes.

Once outside the city, the vehicle committed more traffic violations; it tailgated another car and swerved into oncoming traffic. After observing these additional traffic violations, the police officer turned on his emergency equipment to initiate a traffic stop – which also triggered the police cruiser's mobile video recorder. When the police officer stopped the vehicle, the driver admitted to drinking, failed numerous sobriety tests, showed signs of intoxication, and failed two breath tests. The police officer charged the driver with failing to turn on his headlights and driving under the influence.

The driver filed a motion to suppress before trial. In the motion, the driver argued that the police officer lacked reasonable articulable suspicion to stop his vehicle. The driver contended that the court could not consider the initial traffic violations in Lewes because the police officer did not activate his mobile video recorder to save footage of those violations. The court denied the motion. Following a bench trial, the court found the driver guilty of all charges.

2

The driver appealed to this Court. The driver claims that the trial court erred when it (a) held that the police officer did not have a duty to activate his mobile video recorder when he first suspected criminal activity; (b) held that the police officer possessed reasonable articulable suspicion to stop his vehicle; and (c) admitted evidence of his blood alcohol content at trial. For the reasons stated below, we affirm.

I

While parked in a Rite-Aid parking lot, Sergeant Jonathon Moyer of the Lewes Police Department observed traffic from his police cruiser. Around 11:30 p.m., he saw a vehicle traveling down Savannah Road without its headlights on.[1] Sergeant Moyer drove out of the parking lot and got behind the vehicle. As soon as he did so, the vehicle's headlights turned on. Sergeant Moyer did not stop the vehicle; he instead followed the vehicle to further observe the driver's behavior.

Sergeant Moyer saw the vehicle commit a second traffic violation. The vehicle weaved within its lane and then left the roadway, driving onto a bike trail located in the shoulder. Once again, Sergeant Moyer decided to continue following the vehicle instead of pulling it over. He followed the vehicle beyond the municipal limits of the City of Lewes.

Sergeant Moyer next observed the vehicle approach the rear of another car and

---

[1] App. to Opening Br. at A19–20, A31 [hereinafter A__] (Suppression Hr'g Tr. dated May 14, 2025, at 17:21–18:24, 28:9–16) (Sgt. Moyer) [hereinafter Supp. Tr.].

brake repeatedly, as if the vehicle was having difficulty matching the speed of the car in front of it. While tailgating the other car, the vehicle accelerated and crossed over the center double yellow lines into oncoming traffic, barely avoiding a head-on collision with a truck. Sergeant Moyer had seen enough, and he immediately activated his emergency equipment to initiate a traffic stop. When Sergent Moyer activated his vehicle's emergency equipment, his vehicle's dash-mounted mobile video recorder ("MVR") began to save video footage of the events transpiring in front of his police cruiser. The MVR also had the capability to, and did, save the thirty seconds of footage before it was activated.

After pulling over the vehicle, Sergeant Moyer approached the driver's side window. As he neared the vehicle, Sergeant Moyer smelled a strong, pungent odor of alcohol. The driver was the appellant, Henry Tang. Tang admitted that he recently consumed two to three beers. Sergeant Moyer had Tang perform the alphabet and counting tests. Although Tang cooperated, he smelled of alcohol, appeared lethargic, and slurred his words. Sergeant Moyer therefore asked Tang to perform three field sobriety tests: horizontal gaze nystagmus ("HGN"), walk-and-turn, and one-legged stand.

Tang fared poorly on all three tests. When Tang performed the HGN test, his eyes drooped, and Sergeant Moyer had to repeatedly remind him of the test-at-hand. During the walk-and-turn test, Tang did not keep his arms by his sides as instructed and repeatedly failed to touch his heel to his toe. Tang failed the one-legged stand test as

4

he was unable to maintain his balance for more than five seconds.

Sergeant Moyer suspected that Tang was intoxicated so he arrested him and transported him to the police station. There, Sergeant Moyer administered two breath tests using an Intoxilyzer 9000 ("I-9000"). Tang's blood alcohol content ("BAC") registered 0.166 and 0.162, exceeding the legal limit. Tang was indicted for driving under the influence ("DUI") and failing to turn on his headlights.[2]

Before trial, Tang filed a motion to suppress all evidence leading up to his arrest, arguing that Sergeant Moyer lacked reasonable articulable suspicion to stop his vehicle. Tang asserted that his claim applied to the traffic violations that allegedly occurred inside and outside of Lewes. In response, the State contended that Sergeant Moyer witnessed Tang, in Lewes, driving without his vehicle's headlights on at night, driving erratically, and driving in the bike lane – all of which were grounds to stop Tang's vehicle. The State argued next that, outside of Lewes, Sergeant Moyer witnessed Tang tailgating another car and swerving over the center double yellow lines into oncoming traffic. The court denied the motion, finding that reasonable articulable suspicion existed based on the "totality of the circumstances as viewed through the eyes of a reasonably trained police officer in the same or similar circumstances."[3]

Tang also filed a motion to compel before trial. In that motion, Tang requested

---

[2] Ai (Super. Ct. Dkt. No. 3).

[3] A54–56 (Supp. Tr. 49:20–51:17).

that the State produce the manual for the I-9000. At the suppression hearing, the State represented to the Court that there was no manufacturer-generated manual and instead offered to produce three standard operating sheets that are kept with the machine.[4] The State also advised Tang's counsel that he could schedule a time to review presentation slides used in I-9000 training.[5] Tang was not satisfied and argued that the I-9000 manual was necessary to lay a foundation for admitting BAC evidence; the court disagreed and denied the motion to compel.[6] At the suppression hearing, the court ordered the State to produce the same Intoxilyzer documents that had been submitted in an unrelated pending Superior Court case, *State v. Brown*.[7] The State complied and included the three standard operating sheets with its production.

After reviewing the State's supplemental production, Tang filed a motion requesting that the court suppress the I-9000's BAC results, arguing that he could not properly cross-examine Sergeant Moyer without the manual. The State, in response, reiterated that no manual existed and therefore it had nothing to submit. Following a virtual conference, the court denied Tang's request based on the State's representation

---

[4] A116 (Intox. 9000 Guide: Subject Test by Operator), A117 (Standard Operating Procedure for Intox.: Model 9000), and A118 (Intox. 9000 Exception Message Info. Guide). These operating sheets: (1) outlined steps needed to administer a breath test with the I-9000; (2) instructed police officers to ask a suspect to remove any (non-permanent) dentures and then observe the suspect for twenty minutes before administering the breath test; and (3) listed error messages that may appear on the machine and proposed solutions.

[5] A126 (Trial Tr. dated May 28, 2025, at 8:8–20). The State Chemist was shown these slides during her Intoxilyzer 9000 training. Both parties would have been present at the scheduled review.

[6] A97 (Supp. Tr. 10:11–18).

[7] *State v. Brown*, 352 A.3d 328 (Del. Super. 2025).

6

that no manual existed.

The case proceeded to trial. The State called Sergeant Moyer as a witness to establish the evidentiary foundation to admit the BAC results. Sergeant Moyer testified that he is a certified operator of the I-9000, having received his training through the Delaware Crime Lab. He stated that the State Chemist certified and calibrated the I-9000 on April 25 and June 6, 2024. Following Sergeant Moyer's testimony, the State sought to admit the BAC results. Tang objected and argued that Sergeant Moyer did not qualify as an expert witness because there was no evidence from the manufacturer to confirm the accuracy of the training materials. The court disagreed and found Sergeant Moyer qualified to testify based on his training and experience. It also found that the BAC results were not rendered unreliable simply because there is no manufacturer-generated manual. The court admitted the BAC results and subsequently found Tang guilty of DUI.

## II

On appeal, Tang raises a trio of claims. First, Tang argues that the court erred when it held that Sergeant Moyer did not have a legal duty to activate the MVR when he first observed the initial traffic violations in Lewes.[8] Second, Tang argues that the court erred at the suppression hearing when it found that Sergeant Moyer possessed reasonable articulable suspicion to stop his vehicle. And third, Tang argues that the

---

[8] Opening Br. 16, 20–31 (Oct. 20, 2025) (citing *Deberry v. State*, 457 A.2d 744 (Del. 1983); *Lolly v. State,* 611 A.2d 956 (Del. 1992)) [hereinafter Opening Br.].

court erred by admitting the BAC evidence at trial.

III

We review questions of law *de novo*.[9]  Whether a police officer possessed reasonable articulable suspicion to stop an individual is a mixed question of law and fact; however, where the facts are undisputed, this Court conducts a *de novo* review.[10]  Last, we review a court's evidentiary rulings for an abuse of discretion.[11]

A

We address first whether the court erred when it held that Sergeant Moyer did not have a duty to activate his MVR when he witnessed the initial traffic violations in Lewes.  Before addressing Tang's argument, it is important to understand how the Lewes Police Department has configured Sergeant Moyer's Axon MVR, specifically, its recording and saving functions.

Sergeant Moyer's MVR continuously records video footage in "Buffering" mode while he drives.  The MVR's Buffering mode continuously captures video on a rolling 30-second loop and continuously overwrites those 30 seconds until the MVR is activated.[12]  Put simply, under Buffering mode, the MVR does not save footage to

---

[9] *Powell v. State*, 173 A.3d 1044, 1046 (Del. 2017).

[10] *Bloomingdale v. State*, 842 A.2d 1212, 1215 (Del. 2004).

[11] *McGuiness v. State*, 312 A.3d 1156, 1190 (Del. 2024).

[12] Oral Arg. 4:00–4:45; Axon, *Axon Fleet 3: Admin settings* 1:00–1:23, https://tinyurl.com/AF3Video (last visited July 13, 2026).  Axon's Fleet 3 MVR was released in June 2021.  *Press Release: Axon Fleet 3 Has Arrived*, https://tinyurl.com/AxonPress (last visited July 13, 2026).

8

permanent local storage until it is activated. Once activated, the MVR enters "Event Recording" mode – it begins to save footage. Event Recording mode is triggered whenever the patrol vehicle exceeds a certain speed, the officer manually turns it on, or the officer engages the vehicle's emergency equipment.[13] In Event Recording mode, the MVR saves not only the events as they occur in real-time, but it also saves the previous thirty seconds of buffered video before it is activated.[14]

The MVR also has a setting called "Video Recall" mode.[15] When Video Recall mode is enabled, it allows the MVR to store "up to 24 hours of video" to local storage and overwrites the "oldest video segments to make room for new" segments.[16] Video Recall mode operates independently of Event Recording mode, so neither setting overwrites the other's recordings.[17]

Having explained the relevant MVR settings, we now return to their application in this case. Here, Sergeant Moyer observed Tang commit two traffic violations inside of Lewes – driving without his vehicle's headlights on and weaving off the roadway onto the bike trail. Because Sergeant Moyer did not exceed the necessary speed limit,

---

[13] A28–30 (Supp. Tr. 26:2–27:25).

[14] A42 (Supp. Tr. 38:24–39:1).

[15] State's Suppl. to State's Answering Br. ¶¶ 5–7 (Jun. 10, 2026) [hereinafter State's Suppl.]; *see also* Axon, *Fleet 3 User Guide* at 13 (Rev. Oct. 27, 2025), https://tinyurl.com/AxonFleet3 (last visited July 13, 2026) [hereinafter Axon User Guide].

[16] State's Suppl. ¶¶ 6–7; *accord* Axon User Guide at 21. Whether Video Recall mode stores 24 hours of video footage depends on storage capacity, among other factors. *Id.*

[17] State's Suppl. ¶¶ 6–7; *accord* Axon User Guide at 21.

manually turn on the MVR, or engage the vehicle's emergency equipment, the MVR was not activated, and Event Recording mode did not engage. As Sergeant Moyer followed Tang outside of Lewes, he observed Tang commit additional traffic violations – tailgating another car and crossing over the center double yellow lines into oncoming traffic.[18] Because Sergeant Moyer activated his vehicle's emergency equipment when Tang swerved into oncoming traffic, the MVR was activated, it entered Event Recording mode, and preserved the previous 30 seconds of buffered video before the activation.[19]

Based on this sequence of events, Tang argues that Sergeant Moyer had a legal duty to activate his MVR as soon as he saw the first traffic violation. We disagree. Delaware law does not require police officers to record every public interaction.[20] As

---

[18] Relying on 11 *Del. C.* § 1911(c), Tang claims that Sergeant Moyer, as an officer whose jurisdiction is limited to Lewes, did not possess the lawful authority to gather evidence outside of city limits because Sergeant Moyer did not possess probable cause to believe that Tang was driving under the influence before he followed Tang outside of city limits. Opening Br. 31–32. This argument is misguided. Tang ignores 11 *Del. C.* § 1935, which grants municipal law enforcement the authority to pursue an individual outside of their assigned jurisdiction in Delaware when "there is reasonable grounds to suspect that a . . . violation of the Motor Vehicle Code has been committed in this State by such person." 11 *Del. C.* § 1935. *See State v. Cochran*, 372 A.2d 193, 195–96 (Del. 1977) (analyzing § 1935's application). Because Sergeant Moyer witnessed Tang commit multiple traffic violations before leaving the city limits, § 1935 granted him the lawful authority to continue following Tang outside the city.

[19] Video Recall mode would have likely captured Tang's initial traffic violations. However, as Sergeant Moyer was unaware that the Lewes Police Department had activated Video Recall mode and Tang filed his discovery requests more than two months from the date of his arrest, Video Recall mode had already overwritten any of its saved video footage before either the State or Tang knew about this mode.

[20] *See Harris v. State*, 116 A.3d 1243, 2015 WL 4164837, at *2 (Del. 2015) (TABLE) (finding that a police officer did not have a duty to record the defendant's post-*Miranda* statements).

the Superior Court has correctly held: "[p]olice are under no 'affirmative duty to video record all driving under the influence investigations.'"[21] Tang concedes that this is the law in Delaware.[22] But Tang believes that we should depart from this established rule because of Sergeant Moyer's "conscious choice" not to activate the MVR. Tang views this conscious choice as the equivalent of failing to preserve evidence.[23] Tang claims that Sergeant Moyer knew, based on his training, that activating the MVR would have provided "objective" proof of the initial traffic violations, and chose not to do so. We have previously held that a police investigation does not need to be perfect, only "reasonably thorough," and that the evidence must be exculpatory for the police to have a duty to preserve it.[24] Further, the "duty to preserve exculpatory evidence does not

---

[21] *State v. Wise*, 2016 WL 7468058, at \*6 (Del. Super. Dec. 22, 2016) ("[T]he police had no duty to create an MVR. The officer did not breach any duty by failing to record the interaction simply because he had the tools to make a recording. While it is unclear whether he omitted to record through inadvertence, equipment malfunction, or simply because he viewed the interaction as routine, it is clear that his failure to make the recording was not a breach of any duty." (footnote omitted)); *see also DeLoach v. State*, 2012 WL 2948188, at \*4 (Del. Super. July 16, 2012).

[22] Reply Br. 5 (Dec. 4, 2025) (citing *DeLoach v. State*, 2012 WL 2948188, at \*4 (Del. Super. July 16, 2012)) (admitting that "[c]urrent Delaware law does not impose an affirmative duty on police officers to record all DUI investigations.").

[23] Opening Br. 28–29; A51 (Supp. Tr. 46:14–21). During the suppression hearing, Tang also argued that Sergeant Moyer's conscious decision not to activate the MVR entitled Tang to a *Deberry/Lolly* missing evidence jury instruction. Opening Br. 20–21 (citing *Deberry v. State*, 457 A.2d 744 (Del. 1983); *Lolly v. State,* 611 A.2d 956 (Del. 1992)); Reply Br. 7–9. Tang is mistaken. A *Deberry/Lolly* inquiry concerns relief in the form of a jury instruction at trial, and Tang raised this issue at his suppression hearing. The court did not err when it refused to engage in a *Deberry/Lolly* inquiry because it was inapplicable at the time it was raised.

[24] *See Powell v. State*, 49 A.3d 1090, 1101 (Del. 2012) ("Under Delaware law, the police had a duty to conduct a reasonably thorough investigation.").

11

include a duty to seek out exculpatory evidence."[25]  Sergeant Moyer's investigation in this case was reasonably thorough and it was reasonable for Sergeant Moyer to believe that Tang's traffic violations in Lewes were not exculpatory in nature.[26]  Therefore, the Superior Court did not err in relying on Sergeant Moyer's testimony regarding the traffic violations he observed Tang commit within Lewes.

B

Next, Tang argues that the court erred in finding that Sergeant Moyer possessed reasonable articulable suspicion to perform the traffic stop.[27]  "Generally, police officers can stop an individual for investigatory purposes if they have a reasonable articulable suspicion that the person is committing, has committed, or is about to commit a crime."[28]  "Reasonable suspicion is defined as the officer's ability 'to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrants the intrusion.'"[29]

---

[25] *Mason v. State*, 963 A.2d 139 (Del. 2009).

[26] *Weber v. State*, 38 A.3d 271, 275 (Del. 2012) ("Absent any basis for the police to believe the [evidence] exculpated [the defendant], we fail to see what duty the police had to preserve [it].").

[27] Opening Br. 30.  In one sentence, Tang also argues that Sergeant Moyer did not have probable cause to arrest him for DUI.  *See* Opening Br. 32.  Tang does not further develop this argument in his opening or reply brief; therefore, he has waived the argument.  *See In re COVID-Related Restrictions on Religious Servs.*, 326 A.3d 626, 643 (Del. 2024).  And even if the claim is reviewed on its merits, the record contains sufficient evidence to support the court's finding of probable cause.

[28] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (citing 11 *Del. C.* § 1902(a)).

[29] *Id.* (quoting *State v. Henderson*, 892 A.2d 1061, 1064–65 (Del. 2006)).

"In determining whether reasonable articulable suspicion exists, we 'must examine the totality of circumstances surrounding the situation as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.'"[30]

Sergeant Moyer possessed reasonable articulable suspicion to stop Tang. We have held that a single traffic violation is sufficient for a court to find that reasonable articulable suspicion existed to stop a person's vehicle.[31] Tang committed multiple traffic violations while Sergeant Moyer followed his vehicle. Alone or collectively, these violations were sufficient to establish reasonable articulable suspicion to stop Tang's vehicle.

Tang argues further that the court improperly considered the initial traffic violations in Lewes because, in his view, Sergeant Moyer failed to preserve the only "reliable, objective evidence" of those violations when he failed to activate the MVR.[32] Because we hold that there is no duty to activate an MVR at a specific time, Sergeant Moyer had no obligation to save video footage of the initial traffic violations in Lewes. Notably, the court also based its finding of reasonable articulable suspicion on Sergeant Moyer's *testimony* about the initial traffic violations – which the court is permitted to

---

[30] *Id.* (quoting *Jones v. State*, 745 A.2d 856, 861 (Del. 1999)).

[31] *Bease v. State*, 884 A.2d 495, 499 (Del. 2005).

[32] Opening Br. 28–29.

do.  Tang does not explain or cite any authority as to why it was improper for the court to rely on Sergeant Moyer's testimony in reaching its conclusion.  We therefore find that the court did not err when it held that Sergeant Moyer possessed reasonable articulable suspicion to stop Tang's vehicle.

C

Finally, Tang contends that the court abused its discretion in admitting his BAC results at trial because the State did not lay an adequate evidentiary foundation.  Tang claims that the absence of the I-9000 manual, and the State's failure to solicit testimony establishing compliance with the manufacturer's instructions, required the court to deny the admission of BAC results.[33]

Regarding the I-9000 manual, the State cannot provide Tang with a manual that does not exist.  The State provided defense counsel with operating sheets that provided Tang with information that he could have used to challenge the admissibility of the BAC results.  Additionally, defense counsel was also provided the opportunity to review the State Chemist's training materials and chose not to do so—they too could have aided in his challenge.

Regarding testimony to establish compliance with the manufacturer's instructions, we have held that the admissibility of BAC results centers on "providing

---

[33] *Id.* at 36.

14

an adequate evidentiary foundation for the test result's admission."[34] Each case is evaluated by considering the evidence presented and the circumstances of the case.[35] Here, the State laid an adequate evidentiary foundation for admission of the test results.[36] The court was well within its discretion to find that a proper evidentiary foundation was established to admit the BAC results.

## IV

The judgment of the Superior Court is **AFFIRMED**.

---

[34] *Clawson v. State*, 867 A.2d 187, 191–92 (Del. 2005).

[35] *Id.*

[36] *See McCoy v. State*, 89 A.3d 477, 2014 WL 1357317, at *1–2 (Del. 2014) (TABLE).